UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
                                                             :
                                                             :   **ORDER AND OPINION**
IN RE WORLD TRADE CENTER LOWER          :   **APPROVING SETTLEMENTS**
MANHATTAN DISASTER SITE LITIGATION  :   **IN 78 CASES**
                                                             :
                                                             :   21 MC 102 (AKH)
                                                             :
------------------------------------------------------------ x

ALVIN K. HELLERSTEIN, U.S.D.J.:

The terrorist attacks of September 11, 2001 spawned one of the largest and most

complex mass tort litigations in history. The final stage involves the claims of over 1,000

individuals who worked in the buildings surrounding the World Trade Center site and allegedly

developed various respiratory and gastrointestinal illnesses as a result of their work. 78 of the

plaintiffs represented by the law firm Worby Groner Edelman & Napoli Bern LLP ("WGENB")

have agreed to settle their claims against most,[1] but not all, defendants and move for the Court's

approval. For the following reasons, the motion is granted and these settlements are approved.

## I.    BACKGROUND

On September 11, 2001, terrorists hijacked and crashed two commercial airplanes

into the North and South Towers of the World Trade Center. The collapse of the World Trade

Center towers left a five-story pile of twisted metal, pulverized concrete, and assorted rubble.

The collapsing towers also spewed a cloud of toxic dust that infiltrated hundreds of buildings

throughout downtown Manhattan. To restore lower Manhattan in the weeks, months, and years

following the attacks, thousands of individuals performed rescue, recovery, and debris removal

at the site of the World Trade Center and in the surrounding buildings. These individuals

---

[1] 26 of the 78 settling plaintiffs have settled their claims against all of the defendants originally sued. The remaining
52 settling plaintiffs have settled their claims against most, but not all, defendants originally sued. In aggregate, the
78 settling plaintiffs have settled their claims with 134 defendants.

subsequently filed over 11,000 claims in state and federal court, seeking compensation for various respiratory and gastrointestinal conditions allegedly developed as a result of the work.

Pursuant to the Air Transportation Safety and System Stabilization Act, the United States District Court for the Southern District of New York has exclusive jurisdiction over all claims arising from, or related to, the terrorist-related aircraft crashes of September 11, 2001. *See In re Sept. 11 Litig.*, 723 F. Supp. 2d 534, 538 (S.D.N.Y. 2010). The cases were consolidated before me. *See id.* In order to adjudicate efficiently the vast number of claims brought by the remediation workers, the cases were divided into three dockets. The 21-mc-100 docket comprised claims brought by individuals who worked at the World Trade Center site; the 21-mc-102 docket comprised claims brought by individuals who worked in the surrounding buildings; and the 21-mc-103 docket comprised claims brought by plaintiffs working at both locations, which were later consolidated with the 21-mc-102 docket. I declined to certify a class for the claims in any of the dockets, holding that each individual claim involved materially different facts related to exposure, causation, and damages. *See, e.g.*, *In re World Trade Ctr. Disaster Site Litig.*, 598 F. Supp. 2d 498, 499 (S.D.N.Y. 2009).

## A.    The TCDI Database and the Selection of Representative Test Cases

The complex nature of the litigation posed significant problems for the management of discovery, motion practice, and trial. This was not a typical mass tort action, in which a single product or event injured plaintiffs in a substantially similar way. Rather, the plaintiffs were exposed to the World Trade Center dust over extended, and varying, periods of time; they worked in different areas and buildings for employers utilizing different safety standards; many had pre-existing conditions or a history of smoking; and the plaintiffs alleged a wide variety of conditions to varying degrees of severity. To cope with the unprecedented

complexity, the Court appointed Special Masters Aaron D. Twerski and James A. Henderson, Jr. to organize the fundamental facts of the case in a manageable way.  The Special Masters and the parties developed a set of 360 narrowly-tailored questions seeking case-crucial information.[2] The information received from the plaintiffs was then organized and housed in a "core discovery" database (the "TCDI Database").  The Special Masters and the parties then categorized the plaintiffs in a tiered ranking system based upon the severity of the injuries as reflected in standard medical tests.[3]  *See* Decl. Christopher R. LoPalo Supp. Pls.' Mot. Court Approval Settlements ("LoPalo Decl."), Exh. C.  Based upon the information collected in the TCDI Database, the parties and the Court (assisted by the Special Masters), selected test cases to proceed to intensive discovery, dispositive motions, and trial.  This method was initially applied to the 21-mc-100 cases and, later, to the 21-mc-102 cases.

While the initial purpose of the TCDI database and tiered ranking system was to analyze criteria for selecting representative cases to proceed to intensive discovery and trial, the system and process has played an essential role in settlement.  In June 2010, the plaintiffs in the 21-mc-100 docket and the WTC Captive Insurance Company, Inc. ("WTC Captive"), the City of New York's FEMA-funded insurer, reached a settlement of approximately $716 million in exchange for the dismissal of thousands of claims against the City of New York and its contractors (the "Final Settlement Agreement").  Ancillary settlements with the Port Authority of New York and New Jersey, and with other defendants, brought the figure to approximately $810

---

[2] Such information included the plaintiffs' pedigree, medical history, tobacco use, alleged injuries, medical tests, diagnoses, symptoms, treatments, workers' compensation recoveries, hours worked, location of work, safety equipment worn, and training received. *See* Hellerstein, Hon. Alvin K., Henderson, James A., & Twerski, Aaron D., *The 9/11 Litigation Database: A Recipe for Judicial Management*, 90 Wash. U. L. Rev. 653 (2013); Hellerstein, Hon. Alvin K., Henderson, James A., & Twerski, Aaron D., *Managerial Judging: The 9/11 Responders' Tort Litigation*, 98 Cornell L. Rev. 127 (2012).

[3] The criteria used for categorizing plaintiffs' injuries was based upon the diagnostic system established by the American Medical Association and the American Thoracic Society. *See In re World Trade Ctr. Disaster Site Litig.*, 598 F. Supp. 2d 498, 503 (S.D.N.Y. 2009).

3

million. *See In re World Trade Ctr. Disaster Site Litig.*, No. 21-mc-100, 2010 WL 4683610, at *1-2 (S.D.N.Y. Nov. 15, 2010). Pursuant to the settlement agreements, a neutral third party, aided by a medical panel, determined whether the medical evidence supported each plaintiffs' alleged injuries, and their corresponding tiered ranking, in order to calculate the settlement amount to be awarded and disbursed to each eligible plaintiff. On December 30, 2010, I approved that settlement, finding it to be "fair and reasonable." *In re World Trade Ctr. Disaster Site Litig.*, 871 F. Supp. 2d 263, 267 (S.D.N.Y. 2012); *In re World Trade Ctr. Disaster Site Litig.*, 762 F. Supp. 2d 631 (S.D.N.Y. 2010).

**B.   The 21-mc-102 Docket**

The 21-mc-102 docket is made up of approximately 1,000 claims brought by cleanup workers who, following the 9/11 attacks, cleaned over 100 privately-owned buildings in lower Manhattan. In total, the plaintiffs represented by WGENB brought their claims against 345 building owners, managing agents, tenants, environmental consultants, general contractors, and subcontractors that owned, leased, and performed work in the buildings. The variety of defendants and worksites injected a level of complexity into the litigation that was not present in the 21-mc-100 docket, in which the plaintiffs brought suit primarily against the City of New York and its contractors for work performed at the World Trade Center site and Fresh Kills Landfill.

To manage this complexity, the parties first conducted substantial docket-wide, written discovery in response to the 360 questions intended to elicit case-crucial information as previously described. Plaintiffs then served document requests on all 345 defendants and deposed their representatives. In addition, plaintiffs' counsel deposed treating physicians and other representatives of the Mt. Sinai WTC Health Program, which had conducted studies of the

health effects of the World Trade Center dust on workers. The parties also engaged in expert

discovery with respect to experts designated in the fields of toxicology, industrial hygiene,

occupational safety, and epidemiology. In total, counsel took part in approximately 600

depositions.

      In addition to the docket-wide discovery, the parties also conducted discovery

with respect to 33 representative plaintiffs selected by the Court for "fast-track discovery"

("Fast-Track Plaintiffs"). As with the 21-mc-100 docket, discovery was ordered for this group

of plaintiffs in order to develop the strengths and weaknesses of representative cases and to

potentially facilitate settlement discussions for all the cases. For many of the Fast Track

Plaintiffs, the parties exchanged thousands of documents and data relating to their work history

and medical treatment. Depositions were conducted of the plaintiffs and of the non-party

witnesses such as co-workers and treating physicians.

### C.    Methodology Used in Reaching the 21-mc-102 Settlements

      Plaintiffs' counsel applied the methodology developed in the 21-mc-100 docket to

facilitate the settlements in the 21-mc-102 docket, for which they now seek approval. As

discussed above, each plaintiff was required to submit, under oath, discovery responses to the

TCDI database that provided relevant information including, *inter alia*, the buildings in which

they worked, their alleged injuries, and any pre-existing medical conditions. Plaintiffs' counsel

used this information to categorize each plaintiff according to the tiered ranking system used in

the 21-mc-100 settlement.[4] *See* LoPalo Decl, Exh. C. The amounts disbursed to similarly-

situated plaintiffs in the 21-mc-100 cases were then adjusted based upon the percentage of time a

---

[4] As noted above, this methodology and the resulting settlement in 21-mc-100 were previously held by this Court to be "fair, reasonable, adequate, just and in the best interests of the parties." Order Approving Modified and Improved Agreement of Settlement, No. 21-mc-100, ECF No. 2091, at 3-4 (S.D.N.Y. June 23, 2010); *see also In re World Trade Ctr. Disaster Site Litig.*, 871 F. Supp. 2d 263, 267 (S.D.N.Y. 2012); *In re World Trade Ctr. Disaster Site Litig.*, 762 F. Supp. 2d 631 (S.D.N.Y. 2010).

plaintiff spent in a particular building, the defenses available to a particular defendant, and other relevant considerations tending to affect a plaintiff's potential recovery and the strength of a defendant's defense against potential liability.[5]

Using this methodology, Plaintiffs' counsel engaged in settlement negotiations with representatives for each defendant. Settlements have now been reached between various defendants and 78 plaintiffs represented by WGENB. *See* LoPalo Decl., Exh. B. For each plaintiff, WGENB has provided the Court with information relevant to the settlements, including, *inter alia*, the plaintiffs' age, job title, alleged injuries, tiered ranking, pre-existing conditions, smoking history, and disabilities. *See id.* The submission also provides the buildings in which the plaintiff worked and the time spent in each, as well as both the settlement amount and the estimated hypothetical recovery under the settlement terms reached in the 21-mc-100 docket. *See id.* Based upon this information, the Plaintiffs now seek the Court's approval of the settlements.

## II.   DISCUSSION

Courts confronted with mass tort cases have an obligation to ensure the fairness of settlements entered into by the parties. *See In re World Trade Ctr. Disaster Site Litig.*, No. 21-mc-100, ECF No. 2091 (S.D.N.Y. June 23, 2010); *In re Zyprexa Liability Litig.*, 424 F. Supp. 2d 488, 491-92 (E.D.N.Y. 2006). Because of multiple representations by counsel of differently situated plaintiffs, individual settlements can raise issues of conflicts of interest, as between plaintiffs' attorneys and the differently situated plaintiffs those attorneys represent.[6] An aggregate settlement may be the result of arm's length negotiations, but the allocations to

---

[5] Such facts included, *inter alia*, a defendant's legal status and the corresponding legal duty owed to a plaintiff to provide a reasonably safe workplace; the nature of the work performed by the plaintiff and the corresponding legal protections for such work; and the sufficiency of the evidence with respect to causation and damages.
[6] *See generally In re World Trade Ctr. Disaster Site Litig.*, No. 21-mc-100, 2015 WL 437758, at *4 (S.D.N.Y. Jan. 16, 2015); Erichson, Howard M., *The Role of the Judge in Non-Class Settlements*, 90 Wash. U. L. Rev. 1015 (2013).

6

individuals tend to be directed by counsel without negotiations.  Because the Court has inherent

authority to supervise such attorneys, *see In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d

114, 125-26 (2d Cir. 2014) ("[T]he courts have inherent authority to police the conduct of

attorneys as officers of the court."), it has the duty to ensure that the settlements among plaintiffs

are fair.  Accordingly, I ruled by Order dated July 25, 2014 that all settlements in the 21-mc-102

docket would be subject to review by this Court for fairness and reasonableness.  *See* Order

Regulating Settlement Procedures and Granting, in Part, Motion to Preserve Confidentiality of

Settlements, No. 21-mc-102, ECF No. 5340, at 1-2 (S.D.N.Y. July 25, 2014).

There is a "strong public policy" in favor of the settlement of complex litigation.

*In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998).  Courts reviewing

settlement agreements consider two aspects for fairness: the process utilized in reaching the

settlement and the substantive terms of the settlement.  *See, e.g., Wal-Mart Stores, Inc. v. Visa*

*U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("A court determines a settlement's fairness by

looking at both the settlement's terms and the negotiating process leading to settlement.").

Given the current litigation's similarity to complex class actions, the factors considered by courts

in deciding the fairness of class settlements provide a useful guide.

Courts consider several factors in determining the procedural fairness of a

settlement.  The settlement should be the result of arm's length, hard-fought negotiations rather

than the collusion of otherwise adversarial parties.  *See McReynolds v. Richards-Cantave*, 588

F.3d 790, 803-04 (2d Cir. 2009).  Counsel conducting the negotiations should be experienced in

similar cases.  *See Charron v. Weiner*, 731 F.3d 241, 247 (2d Cir. 2013).  Furthermore,

settlement should come at a time when sufficient discovery has been conducted, enabling

counsel and the parties to accurately assess the strengths and weaknesses of their cases. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85-86 (2d Cir. 2001).

Once the proponent establishes that the settlement was reached as a result of a fair process, there is a presumption that the terms of the settlement are also fair and reasonable. *See McReynolds*, 588 F.3d at 803 ("We have recognized a presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement [is] reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (internal quotations omitted). Nonetheless, courts consider several aspects of the substantive terms of a settlement for fairness. These considerations include the complexity, expense, and duration of the litigation; the strengths and weaknesses of the plaintiffs' cases; the attendant risks of bringing the case to trial; and the possible defenses of the defendants. *See Charron*, 731 F.3d at 247. Settlement amounts should not be compared to a "possible recovery in the best of all possible worlds." *In re Imax Secs. Litig.*, 283 F.R.D. 178, 191 (S.D.N.Y. 2013). Rather, "there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores, Inc.*, 396 F.3d at 119.

### A.   Procedural Fairness of the 21-mc-102 Settlements

The considerations favoring the approval of settlement clearly were present here. WGENB is a competent law firm with considerable experience in mass tort litigations, including the 9/11 litigation from almost its inception in 2002. Their negotiations with the defendants were adversarial, there is no evidence of collusion and resolution came at a time when discovery was sufficiently advanced to permit the parties to fairly evaluate the value of the lawsuits they filed. *See In re Bear Stearns Cos. Secs. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 267

(S.D.N.Y. 2012) (finding settlement procedurally fair where parties "conducted extensive investigations, obtained and reviewed millions of pages of documents, and briefed and litigated a number of significant legal issues" because parties had the ability to "gauge the strengths and weaknesses of their claims and the adequacy of the settlement"). The parties conducted nearly 600 depositions of fact and expert witnesses; reviewed documents from approximately 350 defendants as well as numerous third party witnesses and experts; and briefed and argued significant legal issues, including the relevant scope of the New York Labor Law, and the risks and force of potential expert testimony. In addition, the parties' use of the TCDI database and the settlement amounts disbursed in the 21-mc-100 cases, taking into account relevant factual and legal differences with those cases, was an efficient and reasonable method for allocating fair settlement amounts to individual cases.

      **B.**     **Substantive Fairness of the 21-mc-102 Settlements**

Because the settlements are the result of a fair process, the consideration to be paid is presumably also fair, adequate, and reasonable. *See McReynolds*, 588 F.3d at 803. The cases present difficult complexities regarding the conditions of the workplaces, the safety protections extended, and the causal nexus between the ambient atmosphere and the diseases complained of by the workers. Plaintiffs acknowledge that trial itself will be risky, long, and expensive, made longer and more complicated by the presence of numerous defendants. I am particularly persuaded of the fairness of the settlements because they compare favorably, in the aggregate and individually, with the previously approved settlement of the 21-mc-100 cases. *See* LoPalo Decl., Exh. B. Accordingly, I find that the settlement terms are well within the "range of reasonableness" reflective of the "uncertainties of law and fact" and the "concomitant risks and

costs" of litigating the cases through trial. *Wal-Mart Stores, Inc.*, 396 F.3d at 119. I therefore approve the settlements and grant Plaintiffs' motion.

## III.   CONCLUSION

Plaintiffs' motion to approve the settlements is GRANTED. The Clerk shall mark the motion (Doc. No. 5711) terminated. The approved settlements result in the resolution of all the claims brought by 26 of the 78 settling plaintiffs. Accordingly, the Clerk shall dismiss with prejudice the Complaints of those 26 plaintiffs and close their cases (Case Nos. 06 Civ. 8764, 06 Civ. 11552, 06 Civ. 11828, 06 Civ. 11968, 06 Civ. 12813, 06 Civ. 13880, 06 Civ. 14488, 06 Civ. 14671, 06 Civ. 14909, 06 Civ. 15135, 07 Civ. 1534, 07 Civ. 1680, 07 Civ. 5434, 07 Civ. 5554, 07 Civ. 8287, 07 Civ. 10756, 07 Civ. 10804, 08 Civ. 00653, 08 Civ. 2257, 08 Civ. 2264, 08 Civ. 2310, 08 Civ. 2319, 08 Civ. 2326, 08 Civ. 2634, 08 Civ. 2679, and 08 Civ. 2732).

The remaining 52 settling plaintiffs have settled with many, but not all, defendants against whom they have filed claims. The settling and non-settling defendants in these 52 cases will be identified in a chart labeled Exhibit A, attached to a supplemental order to be issued at a later date. The Clerk shall dismiss with prejudice the Complaints of the 52 plaintiffs against the settling defendants identified in Exhibit A. Plaintiffs shall file an Amended Complaint by April 8, 2015, consistent with this Order and Opinion, dropping the settling defendants from the caption and the allegations, but retaining the paragraph numbering of the existing complaint. Defendants' Answers need not be amended.

SO ORDERED.

Dated:       New York, New York
             March 18, 2015
                                         ALVIN K. HELLERSTEIN
                                         United States District Judge